[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
In this case, appellant, Jawann Evans, was convicted by a jury on two counts of aggravated burglary for entering two residences in Painesville and menacing their occupants with a handgun. He appeals, asserting the following as error:
 "[1.] The trial court erred to the prejudice of the Defendant-Appellant when it overruled his Motion for Acquittal Made [sic] pursuant to Rule 29 of the Ohio Rules of Criminal Procedure.
 "[2.] The trial court erred to the prejudice of the Defendant-Appellant when it denied the Motion in Limine and allowed the prosecutor to utilize the Tec-9 handgun as demonstrative evidence."
The first assignment of error is divided into several issues, which we will discuss in a different order.
Appellant argues that the evidence at trial was insufficient to prove that he had an intent to commit any criminal offense when he entered the residences. He says he was only looking for somebody, which is not a criminal offense. He also says there was no evidence that he attempted to rob anybody or that he attempted to steal anything from the houses. However, the burglary counts in the indictment charged in the alternative that he entered the residences with an intent to commit aggravated menacing. When viewed in a light most favorable to the state, the non-movant, there was more than sufficient evidence to create a jury question whether appellant entered the residences with a criminal intent.
Willie Spikes, the owner of the residence at 159 Newell Street, testified that on April 19, 1997, he was watching television with his son and his brother, Keith Spikes. At about 9:00 a.m., he heard a car pull into his driveway and several car doors opening and closing. He looked out a window and saw a maroon Pontiac Parisienne and three black males walking toward his front door. He recognized one of the men as being local to Painesville, but he did not recognize the other two. They knocked on his door.
Keith Spikes testified that, being closer to the door, he got up and answered the door. He saw three black males standing on the porch. He recognized one of the men as James Belfour, a local in the Painesville area and allegedly involved in the city's drug trade. Keith Spikes admitted that he, too, was involved in the drug trade, being at that time under several indictments in federal court for possession of narcotics. Belfour was a "colleauge," so to speak. Keith positively identified appellant as one of the two men he did not know. Keith surmised that the three men might have wanted something to do with drugs, and so he stepped out onto the porch and closed the door behind him. His brother, Willie, was not involved with drugs, and Keith always tried to keep that aspect of his life separate from his family.
Immediately, one of the men that Keith did not recognize, who was later identified as George Church, set upon him in a threatening manner, loudly demanding to know where the "white girl" was. At first Keith did not know to whom Church was referring. When he said as much, Church drew some kind of machine gun out of his coat, and appellant drew a handgun. Keith was not sure if appellant's handgun was a 9mm or a .45 caliber. Church informed him that the "white girl" had sold him bogus drugs the night before and that she cheated him out of about $1,100 dollars. Church had with him a brown baggie that purportedly contained the bogus drugs. Church demanded to know where he might find this "white girl" and also demanded his money back. Keith surmised that Church might have been referring to Shannon Gillespie, a young Caucasian woman he occasionally employed as a drug runner. Keith claimed she was not in the residence. Church pushed past him and opened the door. He and appellant went inside to look for themselves.
Willie Spikes testified that he heard his brother arguing with the men for about a minute, and that shortly thereafter, the two men he did not recognize as Painesville locals, Church and appellant, came into his house brandishing weapons. He positively identified appellant as the second man in his house. Willie said both men were "agitated" and asking about a "white girl" who had stolen their money. Willie testified that Church had a Tec-9 hand-held submachine gun, and appellant had a 9mm automatic pistol. He was not sure, but he thought state's exhibit no. 5 looked like the gun appellant had. Willie testified that he felt threatened by their actions because they barged into his house without his permission with guns drawn. He thought Church might actually use his weapon. He told them that he did not know what they were talking about and that there was no "white girl" present. They searched briefly. Appellant saw a pair of shoes, and asked if they were Keith's. Willie said they were. Appellant took the shoes and the men went outside.
Keith Spikes testified that the men came back out and appellant threw his shoes down onto the porch in front of him. Appellant ordered him to put the shoes on and come with them. Keith's testimony at this point was contradictory. On the one hand, he felt as if he had no choice but to comply. He testified that he was afraid for his life and that he felt threatened. On the other hand, he felt somewhat responsible for the actions of Gillespie, who worked for him, and he felt he should try to make amends. So he went with them, partly by compulsion, and partly by agreement.
Keith was escorted into the back seat of the Parisienne. Belfour drove, and Church sat in the front passenger seat. Appellant sat with Keith in back. Keith testified that Church demanded that he tell them where they could find the "white girl" or that he give them their money. Keith could not recall Gillespie's phone number in the stress of the moment. Appellant observed a lump in Keith's pockets, and, thinking it might be cash, he ordered Keith to pull it out. Appellant pressed his gun into Keith's side and said if Keith did not comply he would shoot. Keith gave him $201 dollars and a bundle of credit cards. Church and appellant were not satisfied with this amount and demanded more. Thinking quickly, Keith suggested they drive to his friend's house to see if he could borrow some money to give them.
Keith testified that he directed them to the residence at 297 West Eagle Street, which was owned by Larry Howard, a friend of the Spikes family. Howard lived there with his son and his brother, Michael Gaston.
When the parties arrived at Howard's residence, Keith got out of the car. He at first thought the other men in the car would allow him to speak with Gaston and/or Howard alone. But when he went up to the door and rapped, the other three were right behind him. Howard's son answered the door, and Keith asked to see Gaston. The boy let him into the small foyer. Gaston's bedroom adjoined the foyer, and Keith opened his bedroom door slightly to talk with him. He said only that he had a "problem" and that he needed to talk with him. The other men then burst into the bedroom.
Michael Gaston testified that on the morning of April 19, 1997, he was dressing for a funeral when his nephew told him that Keith Spikes was there to see him. Keith had barely inserted his head into his bedroom, saying he needed to talk, when three men burst into the room. Two of them pulled out guns. The taller man, George Church, had a Tec-9 machine gun. Gaston testified that the shorter man, appellant, brandished a handgun. Gaston positively identified state's exhibit no. 5 as the weapon appellant had that morning. He was very firm in his opinion. Church began yelling at him about getting cheated out of $1,400 or $1,200 by some girl and was demanding money. Gaston testified that he felt invaded and threatened by the drawn weapons.
Larry Howard testified that he heard a commotion coming from Gaston's bedroom and went downstairs to investigate. At the foot of the stairs, which empties into the foyer, he was confronted by a man with a Tec-9 machine gun. Howard saw appellant there "holding" Keith Spikes. There was some object in his pocket that Howard took to be a gun, although he admitted he did not get a good look at the object, since his attention was focused elsewhere. The man with the machine gun was yelling at Howard about being cheated out of money. Keith testified that, at this point, Church was screaming and threatening to kill everybody in the house, if he did not get his money. Howard turned to go back upstairs, saying he was going to call the police. The man with the Tec-9 pointed it toward him and pulled the trigger but, for some reason, it did not fire. Howard ran upstairs to call 9-1-1. Mike Gaston broke away and ran out of the house and down the street. All the other men left the house.
Belfour, Church, and appellant got into the Parisienne and drove off. It is not clear from the record how Keith Spikes got away from them.
Police responded to Howard's call to 9-1-1. They scoured the neighborhood looking for a maroon Buick or some other GM product. The officers could not find the car.
For some reason, Belfour, Church, and appellant returned to Howard's residence, on foot, some twenty minutes later. Howard saw them approaching and called the police, again.
Officer Ronald Clark responded to the second call. He sped to the Howard residence and, when he arrived, saw Larry Howard and Mike Gaston confronting three men in the street. Officer Clark recognized James Belfour as one of the men in the street. He did not know the other two. He got out of his cruiser, pulled his own weapon, and ordered the trio onto the ground. He had some difficulty in subduing Belfour and Church, who would not readily cooperate, and who kept taunting Gaston and Howard. Appellant obeyed quietly. Other officers arrived to help. They searched the men. On Church, they found a brown baggie of a white, powdery substance that proved to be Benzococaine, a type of counterfeit cocaine. They also found a 9mm pistol on him that the state introduced as exhibit no. 5. Ballistics experts test-fired the gun and found it to be operable. Belfour and appellant were both unarmed. Because the victims were very excited, they were not articulate and the officers had difficulty understanding what had happened. They decided to arrest Church for carrying a concealed weapon and Belfour on an outstanding arrest warrant. Because appellant did not seem to be a part of the taunting between Belfour, Church, Gaston and Howard, and because the information as to his identity checked out, the police decided to let him go.
From the totality of this evidence, a reasonable juror could infer that Church and appellant both intended to use their weapons in such a way as to make the occupants of the Spikes and Howard residences believe they would be shot and perhaps killed if they did not produce information about the "white girl" or give them some money. R.C. 2903.21, the aggravated menacing statute, states that "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of such other person * * *." The state had sufficient circumstantial evidence of an intent to commit aggravated menacing. See State v. Jones (Dec. 17, 1993), Trumbull App. No. 92-T-4764, unreported.
Appellant claims he did not commit menacing because Willie Spikes did not behave as if he had been menaced. He did not depress an alarm button, which would have alerted a private security company to call the police. He also did not call the police himself after the men abducted his brother at gunpoint. But to sustain a charge of burglary, the state does not need to prove that a separate criminal offense actually happened. It only needs to prove that, at the moment of entry, the defendant intended to commit a criminal offense. State v. Brooks (1995),101 Ohio App.3d 260, 265.
Next, appellant argues that the evidence was insufficient to support both the firearm specifications and the aggravating circumstance of having a deadly weapon that elevated the burglary to aggravated burglary. He says there was insufficient proof that he used the 9mm pistol. Although the police had the weapon test-fired, they never examined it to see if appellant's fingerprints were on it. When he was arrested, appellant was unarmed; however, Willie Spikes, Keith Spikes, and Michael Gaston all testified that they saw appellant brandish a 9mm pistol. Willie and Keith Spikes thought state's exhibit no. 5 looked like the pistol, but they could not be sure. Michael Gaston positively identified state's exhibit no. 5 as the weapon appellant used. From this eye-witness testimony, a reasonable juror could find that appellant was using the 9mm pistol when the group entered both houses, but that, after George Church discovered that his Tec-9 was malfunctioning, he appropriated appellant's firearm. The police thereafter recovered it from Church. This is sufficient evidence to support the firearm specifications and the aggravating element of appellant's convictions.
Appellant further argues that the convictions were against the manifest weight of the evidence. He points out that most of the state's witnesses were criminals themselves. Keith Spikes is a convicted drug dealer. So, too, is Michael Gaston, who has prior drug trafficking convictions. Larry Howard was convicted of felonious assault. (Willie Spikes is the only law-abiding citizen to testify at trial.) Appellant also argues that their testimony was inconsistent in several respects. For example, Keith Spikes and Michael Gaston testified that appellant openly brandished his gun in the Howard residence, whereas Howard said appellant had something in his pocket that looked to be a gun. At that moment, however, Howard's attention was focused on Church, who was pointing a machine gun at him. There are other, less significant inconsistencies not worth mentioning. The core of the state's case, however, was that three people saw appellant aid and abet another man by openly brandishing a 9mm pistol and demanding the whereabouts of a person who duped them in a drug deal or the money that she stole. We do not believe the jury clearly lost its way or created a manifest miscarriage of justice in disregarding some insignificant inconsistencies and in adopting the state's essentially uncontroverted version of the core facts.
The first assignment of error has no merit.
In the second assignment of error, appellant argues that the trial court should have granted his motion in limine to preclude the state from using a Tec-9 machine gun, owned by one of the officers, as demonstrative evidence, at trial. Appellant did not renew his objection to the use of the officer's Tec-9 at trial; therefore, he has waived the right to argue the issue on appeal.State v. Brown (1988), 38 Ohio St.3d 305, paragraph three of the syllabus; State v. Hinkle (Aug. 23, 1996), Portage App. No. 95-P-0069, unreported. Even if we were to reach the merits of the issue, we would note that it is within the sound discretion of the trial court whether or not to allow the use of demonstrative evidence, and an appellate court would only reverse the trial court's decision in cases where it abused its discretion. Trittv. Judd's Moving Storage, Inc. (1990), 62 Ohio App.3d 206, 218. In this case, the testimony was to the effect that: (1) there were two guns involved; (2) at one point, appellant had the gun eventually found on George Church; and, (3) Church used another gun earlier. Each gun is capable of being held in one hand. To avoid confusion, as to who held what gun at what time, it was helpful for the jury to be able to see both guns and to understand that the witnesses could have easily distinguished between the two. We find no abuse of discretion here.
The second assignment of error is without merit.
 The judgments of conviction are affirmed. ______________________ JUDGE ROBERT A. NADER
FORD, P.J.,
CHRISTLEY, J., concur.